CASE 72.—ACTION BY ANNA MONTGOMERY AGAINST THE KENTUCKY & INDIANA BRIDGE CO.'S RECEIVERS. —April 30, 1902.

## Kentucky & Indiana Bridge Co.'s Receiver v. Montgomery.

Appeal from Jefferson Circuit Court (Common Pleas Division).

From the judgment defendants appeal.—Affirmed.

1. Negligence—Peremptory Instruction.—It was not error to refuse to instruct the jury to find for defendant at close of plaintiff's testimony, where the proof showed that defendant's servants discovered that plaintiff's horse was frightened at defendant's engine, which was approaching behind another of defendant's engines, before reaching the horse, but failed in any way to lessen the noise made by their engine, which was throwing out smoke, steam and cinders, which fell upon plaintiff's horse and caused it finally to run away, injuring plaintiff.

2. Ordinary Care—Instruction.—An instruction that defendant was required, in operating its train upon the bridge, to exercise the highest degree of care usually exercised by prudent corporations of the same character, while more emphatic in its language than was proper, really only required the defendant to use the highest of ordinary care, was not misleading to the jury or prejudicial to defendant.

3. Contributory Negligence—Instruction.—An instruction defining contributory negligence as the failure of a person to exercise of the degree of care usually exercised by ordinarily careful and prudent persons under the same or similar circumstances to protect themselves from injury, and by reason of which failure they help to cause or bring about the injury complained of, does not lessen the degree of care required of plaintiff, and inasmuch as plaintiff was not shown to be guilty of any negligence, even if improper, the instruction was not prejudicial to defendant.

4. Duty of Passenger Upon Bridge.—A passenger using the

highway part of a toll bridge does so with a knowledge that the company in operating its railway trains over the bridge has necessarily the right to make all usual and reasonable noises incident thereto, and must act for his own safety with reference to such right.

5. Duty of Bridge and Train Operators to Passengers on Bridge.—Greater care is required of a corporation which uses its bridge, both for the operations of trains and as a toll highway for passengers, than is required of one operating trains parallel with an ordinary public highway, and the bridge company is required to keep a lookout for the purpose of discovering whether teams have become so frightened as to become unmanageable, and in such case it is its duty not to cause any more noise than is necessary under the circumstances.

HUMPHREY, BURNETT & HUMPHREY for appellant.

J. W. S. CLEMENTS for appellee.

OPINION OF THE COURT BY JUDGE O'REAR—Affirming.

Appellants operate a railway and toll-highway bridge across the Ohio river connecting the cities of Louisville and New Albany. A board fence seven feet high separates the railway track from that part of the bridge used by footmen and wagons. On January 16th, 1898, appellee and a companion occupying her buggy paid the toll for passage across the bridge from Louisville. They met a heavy freight train, with a locomotive at each end. Appellee's horse took fright at the noise of the train, and she claims after that fact and her peril had been discovered by those in charge of the second locomotive, they took no steps to stop its noise, but continued it, the locomotive throwing out smoke and steam, as well as hot cinders which lit on the horse's back, causing it to run away, demolishing the buggy and harness, and seriously injuring appellee. In this suit for damages the jury awarded her a verdict of $800.

The matters urged as error by appellant are: 1st, that the court should have given the jury a peremptory instruction at the close of plaintiff's case, or the close of all the evidence, for a non-suit; 2nd, that the verdict is not sustained by the evidence; and, 3rd, that certain instructions offered by appellant, but rejected by the court should have been given, while those given did not correctly present the law of the case.

On the first point, if the evidence on behalf of plaintiff was such altogether as full credit being given to it by the jury, would have warranted a verdict for the plaintiff, the peremptory instruction for a non-suit should have been refused.

Appellee and her companion each testified that the horse became frightened at the first locomotive and showed plainly its nervousness, but was not beyond her control; the train was of about 22 cars; that before they came up with the second locomotive the fireman and engineer were both on the side of the engine next to the driveway in use by plaintiff, and they saw her, and saw that her horse was frightened and trying to run, but that instead of stopping or attempting to reduce the noise of the locomotive, which was, as they testified, throwing out an unusual quantity of steam, smoke, and sparks or cinders, and making a great deal of noise, these trainmen merely stood and laughed at her predicament; that the sparks or hot cinders from the locomotive fell on her horse's back and burned it, from all of which it ran away, causing her serious injury. A trainman who was on top of the cars, and about 100 feet in front of the second locomotive testified for plaintiff that he saw the horse was frightened; that the locomotive was making considerable noise, which was not stopped till

after the horse ran away. Other witnesses testified that the horse when caught a few minutes afterwards showed a number of burned places on its back, described as such as might have been caused by sparks or hot cinders being dropped on it; that the horse was not wild; had been frequently driven across that bridge before the accident. Appellee's physicians and others testified that her injuries were serious; she was unconscious for a time, suffering from a severe and dangerous wound on the back of the head; one leg broken or dislocated; wrist sprained and dislocated, and severely sprained and injured in the back and side, beside some minor wounds. Septic poisoning followed in a few days, from which appellee was unconscious for eight days or longer; she was confined for about three months by these injuries, and at the time of the trial, about three years after the injuries, continued to suffer from them, and her physician testified that it was probable that the injury to her head would prove to be a permanent one.

If the jury believed this evidence, appellee was entitled to a verdict under the law governing her rights and appellants' duties and liabilities in the premises. The peremptory instruction was properly refused.

The engineers and firemen in charge of the two locomotives testified that their respective engines were in good order, spark arresters being provided of approved pattern, which were in good condition; that the engines were not making more noise than customary and necessary in their operation. Those in charge of the second locomotive denied that they saw any symptoms of fright in the horse, or that they laughed at plaintiff's situation, but that seeing the buggy coming, with the two women in it, they shut off steam before the horse came up, and that the horse

did not start to run till after it had passed them. They denied that sparks or cinders were being emitted by their engine. Thus there was a pretty well defined issue of fact presented by this testimony. But it was shown that appellee was running a house of prostitution; that her companion on this occasion was a visitor who was there probably for immoral purposes; that others of her witnesses were shown to be frequent visitors at her house, or employed there; that the trainman who testified for appellee told an improbable tale in some particulars; in fact, excepting appellee's physicians, about all of her witnesses were supposed to be discredited, either by their manner of testifying, or their character, as evidenced by their employments, or lack of them. This much, however, seems to be undoubtedly true: The women were passengers on the bridge, having paid the requisite toll; they were driving a horse that had frequently been driven over the same bridge, presumably meeting the ordinary conditions found there; that on this occasion the horse took fright after meeting the train, became unmanageable, ran away and injured the occupants of the buggy. There was undeniably a cause for this. Both sides agreed that meeting the first locomotive was not the sole cause of the runaway. Something somewhat unusual must have happened after that, to have occasioned it. The woman's story, as corroborated by the brakeman, is not an improbable one. It was necessary for the jury to believe one side, or the other. They had before them facts, including certainly as much of the characters of plaintiff's witnesses as was proper to be shown in the manner done in this case. We cannot say that the jury gave improper weight to appellee's evidence. The conclusion of the jury on this point was certainly

within the legitimate scope of the privilege of their office.

We conclude that the verdict of the jury was not contrary to the evidence.

The court instructed the jury as to appellant's duty that in operating its train upon the bridge appellant was required to exercise the highest degree of care usually exercised by prudently managed corporations of the same character, to prevent injury to passengers on foot or in vehicles that may be using the bridge the same time that a train is passing; that a failure to exercise that degree of care in the management of the train was actionable negligence. The court further said:

"I will further say to you, that if you believe from the evidence that in the operation of this particular train which is said to have caused the injury complained of, no more noise was made than is usually incident to the operation of such trains, then the defendant cannot be said to be guilty of negligence in the operation of that train. But if you shall believe from the evidence that the plaintiff's horse became frightened, and those in charge of the train saw that it was frightened, then it became their duty to take such steps as was within power to prevent the accident which is claimed to have resulted from the fright of the horse, and if they after seeing the fright of the horse and the peril of the lady failed to take such steps as were at hand by which they could have prevented the noise and the consequent injury, if they could have so prevented it, then it was negligence upon the part of the defendant's agents in not so doing, if they did fail to do it."

It is complained by appellant that the court should not have exacted from the bridge company a higher

or different degree of care than was required of the traveler appellee.  The opinion in case of L. & N. R. R. Co. v. Smith, 21 L. Rep. 857 is relied on.  That case recognizes a principle which we believe to be sound, and in nowise in conflict with the one applied by the trial court in this case.  In the Smith case the traveler was upon a highway running parallel to the railroad.  His horse took fright at the train.  The court told the jury that if the employes in charge of the engine could have known by the use of ordinary care that the continued whistling would cause plaintiff to lose control of his team, a recovery for plaintiff would be authorized for injuries caused by the act. This court held that the continued whistling after those in charge of the engine saw that plaintiff's horses were frightened, was negligence.  "But," it was added, "there is no rule of law that would require employes in charge of an engine to discover the condition of a team or persons on a highway running parallel with the railroad.  (Lamb v. Old Colony R. R. Co. 140 Mass. 79.)  While it is not their duty to discover such things, yet if the employes do see the apparent danger, it then becomes the duty of such employe to use care to avert the injury.  As to persons not on the railroad the obligation to observe care begins when the danger is discovered."

Another line of cases is relied on also by appellant to the effect that those using a railway-highway crossing are bound to use the same degree of care to protect themselves from injury as the railway company is required to use to keep from injuring the traveler.  (L. C. & L. R. R. Co. v. Goetz's Adm'r, 79 Ky., 449; A. T. & S. F. R. R. Co. v. McClurg, 59 Fed. Rep. 862; and L. & N. R. R. Co. v. Cummins, 23 Ky. Law Rep. 631, etc.)  In all those cases the traveler

was using the highway crossing. No amount of reasonable care on the part of those operating the railroad train would likely prevent injury to the traveler unless he too exercised the same care in using the crossing. Carelessness on his part in attempting to use the crossing at the time a train was passing would inevitably lead to his injury. The traveler upon the bridge in this case was the bridge company's passenger; as such was entitled to that degree of care that looks out for her presence with a view to preventing her injury. This duty, in part growing out of the reasonable probability of frightening teams under the conditions existing, would seem to call for something more than a mere negative responsibility.

The instruction given by the court really told the jury that the bridge company was required to use the highest of ordinary care—not the greatest possible care. Ordinary care has no grades known to the law. This instruction, when reduced to analysis was, that the bridge company was required to observe ordinary care. The emphatic form used by the court while improper does not seem to have misled the jury, or prejudiced appellant's rights. As to appellee's contributory negligence the court told the jury:

"Contributory negligence means the failure of a person to exercise the degree of care usually exercised by ordinarily careful and prudent persons under the same or similar circumstances to protect themselves from injury, and by reason of which failure they help to cause or bring about the injury complained of."

In other words, the jury were told that it was the bridge company's duty to observe the best care usually observed by ordinarily prudent bridge operators under similar circumstances, to avoid the injury; and

that it was the duty of the traveler to use that degree of care usually exercised by ordinarily careful persons similarly situated to protect themselves from injury. There is no material difference between the degrees of care required to be observed. In this case there was no pretense of showing by the evidence that appellee was guilty of any contributory negligence. An instruction on that point might well have been refused. It is not seriously argued that too high a degree of care was required of the bridge company. Simply, that too low a degree was placed for the appellee. As she was shown not to have been guilty of any negligence it is not material whether the instruction as to the care required of her was literally correct, so long as she has no reason to complain of it.

It is further complained by appellant that the instructions made it the duty of appellant to look out for teams, and that a failure to see them, when it might have been done by the exercise of proper care, was equivalent to seeing them when frightened and then failing to use due precaution to stop the noises causing the trouble, so far as was possible. This is said to be in conflict with L. & N. R. R. Co. v. Smith, supra.

We do not place such construction on the instructions given, but rather the contrary. We are of opinion, though, that a different rule might be applied in a case like the one in hand to one where the traveler is upon a parallel highway to the railway. The bridge company should maintain a reasonable lookout for the safety of its passengers on its bridge, from whatever cause connected with the company's acts, or those of its servants.

The court in the instruction quoted properly recognized that it was the right of the defendant to make

such noise as was usual and incident to the movement and operation of its engines at the time and place and in the work in which it was engaged. No one is responsible for injuries resulting from unavoidable accidents while engaged in a lawful business. So a passenger using the highway part of the bridge does so with a knowledge that the company in operating its railway trains over the bridge has necessarily the right to make all usual and reasonable noises incident thereto, whether occasioned by the escape of steam, rattling of cars or other causes, and persons whose duty calls them near a railway must be presumed to know of this right and to act for their own safety with reference to such right. (L. L. A. & C. Railway Co. v. Schmidt, 134 Indiana. 16; 33 N. E. 774; N. N. & M. V. Co. v. Howard, 14 Ky. Law Rep. 476.)

It also follows that those operating the railroad trains over this bridge must know that people are using other parts of the bridge for the purpose of passing with their vehicles; that teams are liable under such conditions to take fright at even the usual, customary noises incident to the operation of trains. Therefore as such bridge passengers are passengers of the company who are operating the trains, and are entitled to more than a negative care, the trainmen should keep a lookout for the purpose of discovering whether teams have become so frightened as to become unmanageable and dangerous to their drivers and to others on the bridge. In such case it would be the duty of those in charge of the train, so far as they reasonably could, to shut off the exhaust of steam and not cause any more of noise than is necessary under the circumstances. Nothing unreasonable is by this required of those operating the

trains. They are simply compelled to keep a look-out to observe whether their presence is causing danger to teams and passengers using other parts of the bridge by license from its owner, and if they do observe that it is, then it becomes their duty to do what in reason and humanity they can do and ought to do to prevent an injury.

We perceive no error in the proceedings and the judgment is affirmed with damages.

The whole court sitting.

JUDGE O'REAR DELIVERED THE FOLLOWING RESPONSE TO PETITION FOR RE-HEARINGS

In the unusually able petition for re-hearing filed for appellant the following propositions are presented and relied upon with much earnestness. It is asserted (1) that the authorities cited in the petition show conclusively that this court committed a grave error in holding that the relationship of common carrier and passenger existed between the appellants and the appellee, and that the appellants (receivers of the bridge company) owed to the appellee (a person driving over the bridge) that high degree of care which the law exacts of a common carrier towards its passengers. (2) That the instruction given by the lower court, requiring of the appellants the highest degree of care, was almose identically the same instruction which the Court of Appeals in Cummins v. L. & N. R. R. Co., 23 Ky. Law Rep., 681, held was reversible error. (3) That "it is altogether inconsistent for this court to say in its opinion, that the instruction given by the lower court was error, and still say that it did not mislead the jury."

In response to the first proposition it must be noted that the court did not say that the same high degree

of care was exacted of the bridge company in this
case which the law exacts of a common carrier to-
ward its passengers. Exactly the contrary was held.
What the opinion did hold was that in this case the
Bridge Company did something more than merely to
furnish a toll highway to be used in part by railway
vehicles of others, and under the charge of others,
and in part by private vehicles driven on the highway
part of the bridge, and in part by foot passengers.
This Bridge Company itself operates the trains
across the bridge. Its duty is therefore more than to
merely furnish a highway. It furnishes a highway, it
is true, but it occupies it in part itself, itself conduct-
ing the traffic over the steam railroad part of the
bridge, and therefore it is required not merely to
furnish a safe highway so far as its structure is
concerned, but in view of the situation necessarily
somewhat dangerous to travelers because of the
probability of teams becoming frightened at its
trains, it must operate its trains with knowledge
of this fact in mind, and with the duty to look
out reasonably for the safety of those of its cus-
tomers who are using the roadway of the bridge. In
all of the cases cited by appellant under this head, so
far as we have been able to see, the bridge was used
as a highway only, the owners of the bridge not using
it for purposes of transportation. While we use the
expression in the opinion that the traveler was a pas-
senger of the bridge company, that expression was
not used in the sense that it is where the passenger is
in the sole charge of the common carrier. He is a pas-
senger only in the sense that any other traveler upon
any other toll bridge would be a passenger. In such
case as the one at bar, where the bridge company also
uses the bridge for a purpose that is necessarily dan-

gerous to its licensees traveling upon it, it must regulate its own use by the duty suggested by humanity to use ordinary and reasonable care in looking out for the safety of such travelers.

Under the second proposition it will be observed by a comparison of the instruction given, that in the case of Cummins v. L. & N. R. R. Co., supra, there was not only a difference in the duty owing by the railroad company to the traveler upon the highway, but there is a marked and material difference in the wording of the instructions. In the Cummins case the jury were told that it was the duty of the company to exercise the highest degree of care to avoid injury to persons at the crossing. In the case at bar the instruction was that the company was required to use the highest degree of care usually exercised by prudently managed corporations of the same character to prevent injury to passengers who may be using the bridge at the same time a train was passing. How the degree of care usually exercised by prudently managed corporations of the same character is necessarily ordinary care, whatever it may be. If similar corporations, prudently and properly managed, usually exercise an extraordinary degree of care, then an extraordinary degree of care would be the care ordinarily exercised by such corporations under such circumstances. Therefore it follows that the highest degree of care usually exercised means that care ordinarily exercised by such corporations in the conduct of similar business, and while, as said in the former opinion, the instruction may have been phrased more satisfactorily it was not probably misleading.

Furthermore we find that the court gave to appellant more favorable instructions on the question of contributory negligence than it was entitled to; in

other words it was entitled to none on that subject, and in view of the record on the whole case we were convinced that no substantial right of appellant had been prejudiced by the form of the instruction.

It frequently happens that immaterial errors creep into records. The Legislature to prevent reversals for such, and to prevent reversals in just such a case as this one has provided by Section 134 of the Civil Code of Practice: "The Court must in every stage of an action disregard any error or defect in the ceedings which does not affect the substantial rights of the adverse party, and no judgment shall be reversed by reason of such error or defect."

Upon reconsideration we conclude to adhere to the opinion and decision heretofore announced. Petition overruled.